STATE OF NEBRASKA EX REL. FRED EBKE, APPELLEE, V.
BOARD OF EDUCATIONAL LANDS AND FUNDS OF THE
STATE OF NEBRASKA ET AL., APPELLANTS, RAMEY C.
WHITNEY, INTERVENER-APPELLEE.

65 N. W. 2d 392

Filed July 9, 1954. No. 33559.

*Clarence S. Beck,* Attorney General, *Robert A. Nelson,* and *Richard H. Williams,* for appellants.

*Davis, Healey, Davies & Wilson* and *Robert A. Barlow, Jr.,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This appeal results from the decision of this court in State ex rel. Ebke v. Board of Educational Lands & Funds, 154 Neb. 244, 47 N. W. 2d 520, modified at 154 Neb. 596, 47 N. W. 2d 526, hereinafter referred to as the Ebke case, and involves a judgment for attorney's fee and expenses incurred in the above-mentioned litigation.

When the trial court entered judgment on the mandate in the Ebke case, leave was granted the relator and his attorney to file an application for expenses and attorney's fee which were necessitated by the Ebke litigation against the respondents constituting the Board of Educational Lands and Funds of the State of Nebraska; the State Treasurer, although a member of the Board, separately as being intrusted with the ministerial duty of keeping an accurate and correct account of the receipts, disbursements, and balances on hand in the perpetual school trust fund; and the Attorney General, also a member of the Board, separately as the legal ad-

viser of the respondents. Notice was given the Attorney General as provided by statute. The relator, Fred Ebke, and his attorney, Paul W. White, filed an application in the district court for allowance and recovery of expenses and attorney's fee. This application set forth the following: That in the second amended petition for declaratory judgment filed in the above-entitled case the relator alleged that relator was a citizen, a resident, and a taxpayer of School District No. 20 of Deuel County, Nebraska; that he was married and had been a resident of the State of Nebraska for over 30 years; that he was a taxpayer of the State of Nebraska, and a taxpayer of School District No. 20 of Deuel County, Nebraska; and that he was prosecuting the action as an individual, a taxpayer, a citizen, and on behalf of all other citizens, residents, taxpayers, and parents having children attending public schools, "and also for and on behalf of each and every public school district which is or may become a beneficiary of the perpetual school fund of the State of Nebraska." The application set forth the purpose of the litigation, the proceedings had therein, and the result obtained, asserting that an increase in the Nebraska school lands trust fund in excess of four million dollars resulted from the Ebke litigation; that further increases will occur in the future; and that during the course of this successful litigation Paul W. White acted as attorney for the relator Ebke and had received no remuneration for his services.

The respondents filed objections to the above application. The same, insofar as necessary to consider in this appeal, are as follows: The benefits which have accrued to the Nebraska school lands trust fund through the sale of leases at public auction were not the direct result of the litigation herein conducted by the relator and his attorney; and the litigation herein was conducted for the personal benefit of the relator and not for the benefit of the trust. Upon hearing held on the application and the objections thereto, the district court

entered a decree allowing the applicants' expenses in the amount of $625, and attorney's fee in the amount of $60,000 to be taxed as costs in this action, and decreeing that the custodian of the Nebraska temporary school lands fund, the defendant Treasurer of the State of Nebraska, be directed and ordered to pay said amount, together with all costs of this present action, out of the Nebraska temporary school lands fund, said amount being a legitimate and just charge against said fund.

The respondents filed a motion for new trial and an amended motion for new trial which were overruled. From the order overruling the motions for new trial, the respondents appeal.

Hereafter respondents will be referred to as appellants; the Board of Educational Lands and Funds of the State of Nebraska as the Board; the relator Ebke as appellee Ebke, or Ebke; and attorney Paul W. White as appellee White, attorney White, or Ebke's attorney, or when both appellees Ebke and White are used together, as appellees.

At the regular session of the Legislature in 1947, legislative bill No. 33 was enacted, being Laws 1947, chapter 235, page 743, relating to the leasing of public school lands of the state. Section 7 of the act, later designated as sections 72-240 and 72-240.01, R. R. S. 1943, purported to grant to existing leaseholders an absolute right to renewal of their leases provided the existing leaseholders conformed to certain standards as set forth in the act.

The record in the Ebke case shows that on December 31, 1924, the Commissioner of Public Lands and Buildings leased Section 36, Township 13, Range 44, Deuel County, Nebraska, to one W. E. Scott for a term of 25 years. On July 2, 1947, shortly after the effective date of legislative bill No. 33, Ramey C. Whitney procured an assignment of this lease for a consideration of $10,000. On July 12, 1949, approximately 6 months prior to the expiration of this lease by its terms, Fred Ebke filed an

application for a lease on this property, setting forth therein an offer to pay a bonus of $2,500 in addition to the annual rent to procure the lease, and in addition, set forth objections to the application of Whitney for a renewal of the lease. The Board overruled the objections to Whitney's application, denied Ebke's application, and granted Whitney's application for a renewal of the lease. Ebke then filed his petition in the district court for Lancaster County for a declaratory judgment, the purpose of the action being to obtain an interpretation and construction, and to test the validity of chapter 235, Laws 1947, and chapter 212, Laws 1949, enacted by the Legislature, designated as sections 72-240 and 72-240.01, R. R. S. 1943. The trial court found against Ebke and declared sections 72-240 and 72-240.01, R. R. S. 1943, to be valid and legal statutes fully in keeping and accord with the provisions of the Constitution of Nebraska, and enforceable according to their terms. Ebke then appealed to this court. This court reversed the decision of the trial court, holding that the provisions of sections 72-240 and 72-240.01, R. R. S. 1943, were violative of Article VII, section 9, of the Constitution of Nebraska which provides: "All funds belonging to the state for educational purposes, the interest and income whereof only are to be used, shall be deemed trust funds held by the state, and the state shall supply all losses thereof, that may in any manner accrue, so that the same shall remain forever inviolate and undiminished; and shall not be invested or loaned * * *." This court also held that the lease involved in the Ebke case was issued without authority of law. This holding required that the lease be sold at public auction.

Pursuant to the judgment rendered in the Ebke case, the lease as described therein was offered at public auction and a 12-year lease on the premises was sold to Whitney who paid a bonus of $10,200 for the lease. Whitney intervened in the Ebke case.

We deem it advisable at this point to relate a brief

history of the manner in which the trust fund with reference to the common schools of this state came into existence.

Nebraska came into the Union as a state by virtue of an Enabling Act of Congress approved April 19, 1864 (13 U. S. St. at Large, § 7, p. 49), which provided: "And be it further enacted, That sections numbered sixteen and thirty-six in every township, and when such sections have been sold or otherwise disposed of by any act of congress, other lands equivalent thereto, in legal subdivisions of not less than one quarter-section, and as contiguous as may be, shall be, and are hereby, granted to said state for the support of common schools."

A Constitution having been regularly approved within the territory in 1866, Nebraska was admitted into the Union on March 1, 1867. By its admission it assumed the privileges and duties of statehood, including those imposed by the congressional Enabling Act which included the acceptance of the lands and funds for the common schools of the state.

Article VII, section 1, of the Constitution of 1866 provided: "The principal of all funds arising from the sale, or other disposition of lands or other property, granted or intrusted to this state for educational and religious purposes, shall forever be preserved inviolate and undiminished; and the income arising therefrom shall be faithfully applied to the specific objects of the original grants or appropriations. The legislature shall make such provisions by taxation or otherwise, as, with the income arising from the school trust fund, will secure a thorough and efficient system of common schools throughout the state; but no religious sect or sects shall ever have any exclusive right to, or control of, any part of the school funds of this state."

The 1866 Constitution was replaced by what is commonly referred to as the 1875 Constitution. There was no substantial change made in the 1875 Constitution

affecting Article VII, section 1, of the Constitution of 1866.

In 1920, this state adopted amendments to its Constitution, commonly referred to as the Constitution of 1920. No change was made in this Constitution with reference to the school land trust fund as the same appears in the Constitution of 1866 and the Constitution of 1875. The composition of the board of commissioners has been changed, but not the function of the Board as fixed in the Constitution of 1875.

The provision of the Enabling Act making the grant, and of the Constitution of 1866 setting apart and pledging the principal and income from such grant, and the subsequent act admitting the state into the Union under such Constitution constituted a contract between the state and the national government relating to such grants. See State ex rel. Johnson v. Central Nebraska Public Power & Irr. Dist., 143 Neb. 153, 8 N. W. 2d 841.

In Propst v. Board of Educational Lands & Funds, 156 Neb. 226, 55 N. W. 2d 653, this court said: "The school lands were received and are held in trust by the State of Nebraska for educational purposes. The state as trustee of the lands and of the income therefrom is required to administer the trust estate under the rules of law applicable to trustees acting in a fiduciary capacity." The court also held: "The title to the state school lands was vested in the state upon an express trust for the support of common schools without right or power of the state to use, dispose of, or alienate the lands or any part thereof except as allowed by the Enabling Act and the Constitution."

Anyone dealing with the school lands must do so with the knowledge of and subject to the trust obligation of the state. Enabling Act of Congress, Vol. 2, p. 5, R. R. S. 1943; Art. VII, § 9, Constitution of Nebraska; State ex rel. Ebke v. Board of Educational Lands & Funds, *supra;* State v. Platte Valley Public Power & Irr. Dist., 147 Neb. 289, 23 N. W. 2d 300, 166 A. L. R. 1196; State ex rel.

Walker v. Board of Commissioners, 141 Neb. 172, 3 N. W. 2d 196; Warren v. County of Stanton, 145 Neb. 220, 15 N. W. 2d 757; Propst v. Board of Educational Lands & Funds, *supra.*

The foregoing clearly indicates the manner in which the school lands trust fund was created, how it should be supervised and managed, and the purpose for which it may be used.

The temporary school fund is the fund from which the appellees contend the attorney's fee and expenses of the Ebke case are payable. This is a fund which is paid out to the various counties pursuant to statutory formula for support of the common schools. The statute provides the method of apportionment and the manner in which the apportionment is made for the benefit of the common schools. It is unnecessary to set this section of the statute out in detail. See § 79-1302, R. R. S. 1943.

The appellants contend that the income which has accrued to the Nebraska school lands trust fund through the sale of leases at public auction was not the direct result of the litigation conducted by Ebke and his attorney and that in such a situation an attorney's fee as contended for by the appellees cannot be allowed from the school lands trust fund. The appellees contend that the effect of the decision in the Ebke case was to bring into the Nebraska school lands trust fund an amount in excess of four million dollars as bonuses due to the sale of leases at public auction held after the decision in the Ebke case, consequently, the fund was created and resulted from the Ebke litigation.

Evidence was adduced by the appellees detailing attorney White's experience as a practicing attorney and the extensive preparation and time consumed in bringing the Ebke litigation to a successful conclusion. The appellants do not question that Ebke's attorney acted in the litigation and during the course of it, ably and efficiently conducted the same for his client, and obtained

a favorable result. There is also evidence of competent attorneys who testified in behalf of the appellees to the value of the services rendered by appellee White, taking into account the necessary elements to be considered in this type of litigation.

We have heretofore given a summary of the Ebke litigation and what this court determined by its decision. It is true that the decision in the Ebke case established that sections 72-240 and 72-240.01, R. R. S. 1943, were unconstitutional, but the actual, specific result of that case established that the lease which Ebke sought to obtain could not be held valid and enforceable under the law, but that the lease must be offered at public auction where Ebke would have the opportunity to bid in competition with other prospective bidders who might desire to acquire this lease. The decision in the Ebke case did not order or direct the Board of Educational Lands and Funds to sell at public auction all of the leases which expired and would ordinarily be renewed under the law existing prior to the decision in the Ebke case. Subsequent to the decision in the Ebke case there remained many administrative acts to be performed by the Board of Educational Lands and Funds in order to build the additions to the school lands trust fund and the temporary school fund.

In this connection, it appears that prior to the decision in the Ebke case 2,313 leases had been issued under the 1947 act. On August 13, 1951, the Board requested an opinion from the Attorney General as to the status of these leases. In this opinion the Attorney General informed the Board that all leases issued pursuant to sections 72-240 and 72-240.01, R. R. S. 1943, were void; that the lessees had acquired no rights by virtue of the issuance of the same; and that the Board should take action declaring all such leases void. The lands involved should then be offered for lease at public auctions and notices of sale given by publication for 3 weeks in a legal newspaper published or of general circulation in the counties

in which such lands were located. On the same day the opinion was issued by the Attorney General, the Board adopted a motion in conformity with the opinion, vacated the proceedings under which the leases were made, and notified each leaseholder by letter that the land would be offered for lease at public auctions. The Board commenced the sale of these leases in the fore part of September 1951, and completed the sales in November 1952, with the exception of some that were involved in litigation.

The land appraiser for the Board was placed in charge of the sales of these leases. For the first 3 months it required the services of five men in addition to the appraiser to conduct the sales, then two of the men quit and three continued to work until April 1952, when another one left. The land appraiser and the other party then had charge of the sales.

It was not possible for the Board to hold an auction, as provided by law, to sell all the leases at once. The Board, by necessity, was required to classify the land and the geographical locations, and direct sales to be held of that number of leases which the representative of the Board could conveniently handle. In nearly every case many bids were made and raised. The high bid was reported to the Board for confirmation, but in many cases the Board, for various reasons, refused to confirm the sales and ordered new sales to be held. It is apparent that the Board directly controlled when or if money should come into the fund. No sale was complete until the Board, acting in a quasi-judicial capacity, confirmed the sale. It was the action of the Board which created the fund and, in so doing, the Board, in directing the sale of these leases as above set out, was not following a court order or obeying the mandate of a court. It was the independent action of the Board in what it considered to be its duty under the law.

It was stipulated that numerous actions were brought against the Board during the progress of the selling of

these leases to prevent the sales. Among the cases cited appearing in the stipulation is Propst v. Board of Educational Lands & Funds, 103 F. Supp. 457, wherein an application was made to the Supreme Court of the United States for direct appeal, which was denied. This was an action brought by William Propst, on behalf of himself and all holders of school land leases in the State of Nebraska similarly situated, to obtain an injunction to prevent the Board of Educational Lands and Funds and others from treating as void some renewal leases on state school lands theretofore issued by the Board to plaintiff and to interveners and others in the same class. The question involved was whether the action of the Board violated the Constitution of the United States as impairing the obligation of a contract and denying due process and equal protection of the laws. The court determined that the action of the Board did not violate any of the provisions of the Constitution of the United States as contended for by Propst. Later Propst brought an action in the district court for Lancaster County which was appealed to this court, Propst v. Board of Educational Lands & Funds, *supra*, involving an injunction to prevent the Board of Educational Lands and Funds from treating as void certain renewal leases of state school lands previously issued to appellants and others alleged to be in the same class.

It was further stipulated that in order to obtain possession of certain of these school lands on which the void leases had been issued it was necessary to institute seven forcible detainer actions which included the case of State v. Cooley, 156 Neb. 330, 56 N. W. 2d 129. In this connection, see, also, State v. Gardner, 156 Neb. 326, 56 N. W. 2d 135; Board of Educational Lands & Funds v. Gillett, 158 Neb. 558, 64 N. W. 2d 105; State v. Clark, 158 Neb. 570, 64 N. W. 2d 112; Todd v. Board of Educational Lands & Funds, 154 Neb. 606, 48 N. W. 2d 706, which was an action for declaratory judgment in which appellants sought to have their rights determined and

enforced relative to a school land lease; Watson Hay Co. v. Board of Educational Lands & Funds, 154 Neb. 613, 48 N. W. 2d 711, involving the assignment of a school land lease; Hanna v. Board of Educational Lands & Funds, 154 Neb. 619, 48 N. W. 2d 715, involving an assignment of a school lease; and State ex rel. Raitt v. Peterson, 156 Neb. 678, 57 N. W. 2d 280, an action in mandamus brought by the highest bidder at a public auction of school land leases to compel the Board of Educational Lands and Funds to execute and deliver to the relators a school land lease in accordance with the terms of the bid and the provisions of sections 72-233 and 72-234, R. R. S. 1943. In fact, as stipulated, there were two separate mandamus actions against the Board of Educational Lands and Funds to complete the issuance of leases that had been offered for sale at public auction but where the Board refused to accept the highest bid on the theory that it was not in the best interest of the trust.

The foregoing is in general the litigation before this court involving the Board. From the foregoing it is obvious that a considerable amount of litigation affecting the Board's action in selling the leases at public auction has been had. We can arrive at no other conclusion, from what has been previously stated, but that the fund was created by the administrative action of the Board subsequent to the Ebke decision.

The appellees contend that when a litigant at his own expense has maintained a successful suit for the preservation, protection, or increase of a common fund, or has created at his own expense a fund in which others may share, he is entitled to an allowance for an attorney's fee and reimbursement for expenses incurred in the litigation; and that the payment of an attorney's fee and expenses in a taxpayer's action is based on the general rule that such payments may be made in actions involving trust funds. The appellees cite several cases where the above rules were applied. We believe there is a clear

distinction between the cases cited by the appellees and the case at bar.

The appellees cite Allen v. City of Omaha, 136 Neb. 620, 286 N. W. 916. This action was brought by three retired policemen who were on pensions and direct beneficiaries of the police relief and pension fund of the city of Omaha under the provisions of section 14-610, Comp. St. 1929. This fund was made up of many items involving money forfeited or withheld from members of the police force for various reasons, which were required to be placed in the fund, deducting all expenses incident to the fund. Further discussion of this fund is unnecessary. This court held: "Where the board of trustees of the police relief and pension fund, created under the provisions of sections 14-610 et seq., Comp. St. 1929, fail upon demand to enforce the payment by the city of the amounts therein described, a beneficiary under the fund may properly maintain an action against the city to recover the amount due for the use and benefit of such fund." With reference to the allowance of attorney's fees, the court said: "Where the services of a litigant's attorney result in rescuing or preserving a large amount of property or funds, not only for the benefit of the particular litigant, but for the benefit of all others in the same class, and by means of these services the property or funds are conserved for the benefit of all, the cost thereof, including attorney's fees, should be borne by those benefited by it. Trustees v. Greenough, 105 U. S. 527, 27 L. Ed. 1157; Blacker v. Kitchen Bros. Hotel Co., 133 Neb. 66, 273 N. W. 836; In re Estate of Creighton, 93 Neb. 90, 139 N. W. 827. Clearly, * * * all of the beneficiaries of the police relief and pension fund were benefited by the litigation carried on by these plaintiffs."

The appellees rely upon the case of Pensioners Protective Assn. v. Davis, 112 Colo. 535, 150 P. 2d 974, in which a petition was filed for allowance of attorney's fees and costs of suit, predicated on services rendered, and relief adjudged in Davis v. Pensioners Protective Assn., 110

Colo. 380, 135 P. 2d 142, wherein attorney's fees were held not to be maintainable. This litigation was brought by a number of beneficiaries of the old age pension fund who formed an association to bring a mandamus action against the members of the State Board of Public Welfare which was the trustee of the fund. The action was first brought to compel a retransfer of money to the old age pension fund which had been diverted pursuant to statutory enactment to an emergency and contingent fund. The relief prayed for by the pensioners was granted. The Supreme Court of Colorado held that the allowance for attorney's fees should be made from the money restored to the pension fund since it was a class suit in which the plaintiffs' efforts had benefited pensioners generally. The court said: "If, in the circumstances appearing, the aggregate of the sums illegally diverted from the pension fund, and which were restored thereto by court decree in a cause prosecuted by petitioners against the State Welfare Board as trustee thereof, may be subjected to the expense involved in the accomplishment thereof, court disbursements would constitute a proper item, and counsel fees, reasonably admeasured, would enjoy like legitimacy." 14 Am. Jur., Costs, §§ 74-76, pp. 47-49, is cited therein.

The appellees concede that the petitioners involved in the above-cited cases were direct beneficiaries of the trust fund. Appellees assert that in the Ebke case the common school districts of Nebraska are the direct beneficiaries of the fund and Ebke is a beneficiary only by virtue of being a taxpayer generally and a school district taxpayer in particular.

The appellees cite Fox v. Lantrip, 169 Ky. 759, 185 S. W. 136. This was an action brought by taxpayers of Hopkins County to recover from the appellant $1,840.40 alleged to have been illegally appropriated by the fiscal court of Hopkins County and paid to the appellant for services as county school superintendent for the years 1910, 1911, 1912, and 1913. The court said: "And when,

as in this case, the public authorities whose duty it is to bring a suit to recover public funds wrongfully paid out, refuse to do so, and the duty is thus imposed on the citizen in his private capacity, he should be allowed his attorney fees if successful." The court held: "Citizens who successfully bring suit to recover back public funds wrongfully appropriated should be allowed compensation for their attorneys, payable out of this fund, when it has been collected and paid into the county treasury."

In the case of Village of Bedford v. State ex rel. Thompson, Hine & Flory, 123 Ohio St. 413, 175 N. E. 607, taxpayers of the village of Bedford brought suit against one Wright on behalf of the village and all taxpayers thereof, praying for a judgment against Wright in the sum of $12,079.45, with interest, which sum represented unauthorized payments made by the village to Wright. After failure by the village authorities, upon request, to bring action, this suit was instituted under a section of the general code. The trial court entered judgment in favor of the plaintiffs and allowed $3,400 attorney's fees for plaintiffs' attorney, and that sum was adjudged to be a lien upon the judgment entered. Wright satisfied the judgment. The village refused to pay the attorney's fees, denying the right of the court to make an allowance for attorney's fees in such a case. The court held: "Where a taxpayer, on behalf of himself and other taxpayers of a village, has successfully prosecuted an action to recover money unlawfully paid by such village, and such money has been restored to the village, such action, while for money only, possesses certain equitable characteristics, and the trial court, out of the fund so created, in the exercise of equitable powers, may allow a reasonable fee to the attorneys of the taxpayer, payable out of the fund so created." See, also, State ex rel. Bonner v. Andrews, 131 Tenn. 554, 175 S. W. 563, to like effect.

It is apparent that Fox v. Lantrip, *supra,* and Village of Bedford v. State ex rel. Thompson, Hine & Flory, *supra,* are not cases in any respect similar to the case at bar.

The appellees cite Regan v. Babcock, 196 Minn. 243, 264 N. W. 803, as being somewhat similar to the instant case. In that case taxpayers brought suit in equity to cancel contracts for the paving of state highways, entered into by the commissioner of highways, and for injunctions to restrain the contractors and commissioner from proceeding with the carrying out of such contracts, and for the purpose of recovering for the state money illegally paid out or to be paid out under such contracts. The suits were brought against the commissioner of highways, and the State of Minnesota intervened, requesting the same relief as prayed for by the taxpayers. The court decided that the contracts were void, and in each of the six cases found the reasonable value of the work done by the contractors, and that the state could pay no more than the reasonable value. This resulted in a savings to the state of $390,000. As part of the judgment voiding the contracts the trial court provided that plaintiffs and their attorneys could make application to the court after the entry of the final judgment to have determined what the actual, necessary, and reasonable disbursement of said plaintiffs and their attorneys were in connection with the conduct of the litigation, including attorneys' fees. Such application was made. The Attorney General proposed that the issues be submitted to a jury as to the actual, necessary, and reasonable disbursements of the plaintiffs and their attorneys in connection with the conduct of this litigation and the reasonable value of the services of the attorneys. The jury allowed $5,696 expenses and $60,000 attorneys' fees. On appeal, the state contended that the trial court did not have the power to exercise control over these funds for the payment to be made plaintiffs or their attorneys. The court however determined that the state had subjected itself to the jurisdiction of the court by its action. The court held that a court, in a suit in equity, under the circumstances shown, might allow the plaintiffs compensation for their expenditures, including attorney's fees, out of the funds

recovered or saved, where the suit is brought in a representative capacity for the benefit of a state, municipality, or other beneficiary. From an analysis of this case it must be concluded, from what we have stated previously with reference to the Ebke litigation, that the cited case is not applicable.

The appellees cite State ex rel. Yontz v. West, 135 Ohio St. 589, 21 N. E. 2d 987, affirming 61 Ohio App. 389, 22 N. E. 2d 649. The relator sued in the capacity of a citizen and taxpayer. The action was filed against the respondent as the registrar of motor vehicles of the State of Ohio. The primary relief asked was a writ of mandamus to compel the respondent to collect the motor vehicle license tax from owners and operators of cement-mixing motor conveyances, as required by the provisions of section 6291, General Code. The writ was allowed. Then, in conformity with the prayer of his petition, the relator further asked the court to allow a reasonable attorney's fee and his costs. There was no complaint about the allowance of the writ of mandamus nor the amount of the attorney's fee, nor the capacity of the relator to institute the action. The contention was that there was no authority for granting an attorney fee in this type of case; that the action was brought to compel a public officer to carry out a ministerial duty; and that there was no fund before the court, nor did a fund come into court for distribution, as a result of the action of the relator. The court held that the trial court was vested with the authority to award from tax funds thus realized a reasonable fee to the attorney for the taxpayer, citing Village of Bedford v. State ex rel. Thompson, Hine & Flory, *supra*. It will be observed that in the above-cited case the nature of the action is quite different from the action in the Ebke case. The cited case is not applicable.

Other cases cited by the appellees have been examined, particularly Harbage v. Tracy, 64 Ohio App. 151, 28 N. E. 2d 520, and Dickinson v. Hot Mixed Bituminous In-

dustry of Ohio (Ohio App.), 58 N. E. 2d 78. We deem it unnecessary to set out and distinguish the same. Suffice it is to say they are not applicable to the case at bar.

We are not in accord with the appellees' contention that an attorney's fee and expenses of litigation in the Ebke case may be paid out of the public school lands trust fund. The mere fact that the appellee Ebke prosecuted his action as an individual, a taxpayer, a citizen, and on behalf of all other citizens, residents, taxpayers, and parents having children attending public schools, and also for and on behalf of each and every public school district which is or may become a beneficiary of the perpetual school lands trust fund of the state, is not sufficient in and of itself to warrant an allowance of an attorney's fee to be paid out of the school lands trust fund. We find nothing in the record in the Ebke case to show that Ebke was authorized to represent any of the common school districts of this state who were the direct beneficiaries of the fund, and certainly Ebke was not a direct beneficiary of the fund. Ebke, by this litigation, did not augment the fund. What was accomplished by this litigation was purely incidental to the fund in question. The actual situation is that Ebke prevailed as an individual with respect to one specific lease which was involved in the litigation brought by him and which lease he had an opportunity to acquire at public auction as a bidder in competition with other bidders by virtue of being successful in having declared, under a declaratory judgment action, sections 72-240 and 72-240.01, R. R. S. 1943, to be unconstitutional. The additions to the temporary school fund result from the administrative and independent action of the Board of Educational Lands and Funds. The litigation herein was conducted for the personal benefit of the appellee Ebke, and not for the benefit of the school lands trust fund.

It is the practice in this state to allow the recovery of attorney's fees and expenses only in such cases as are provided for by statute, or where the uniform course

of procedure has been to allow such recovery. See, Blacker v. Kitchen Bros. Hotel Co., 133 Neb. 66, 273 N. W. 836; Higgins v. Case Threshing Machine Co., 95 Neb. 3, 144 N. W. 1037; State ex rel. Charvat v. Sagl, 119 Neb. 374, 229 N. W. 118.

We find no statute in this state that will allow or permit the recovery of attorney's fees and expenses in a case such as the Ebke case.

For the reasons given herein, the judgment of the trial court is reversed and the cause is remanded to the district court to enter judgment in conformity with this opinion disallowing the attorney's fee and expenses allowed by the district court, appellees to pay all costs.

REVERSED AND REMANDED WITH DIRECTIONS.

CHAPPELL, J., dissents.